IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RAYMOND ANDERSON | ) | |
| | ) | |
| v. | ) | CA. No.05-15L |
| | ) | |
| UNITED STATES OF AMERICA | ) | |

~~MOTION~~

Comes now the United States of America, by and through its undersigned attorney, and objects to petitioner's Motion Under 28 U.S.C. to Vacate, Set Aside, or Correct Sentence By A Person In Federal Custody for those reasons stated in the accompanying Memorandum in Support.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

GERARD B. SULLIVAN
Assistant U.S. Attorney

7

CERTIFICATE OF SERVICE

I hereby certify that on this 14th of March 2005, I served a copy of the within Government's Motion to Its Objection to Defendant's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody, with Accompanying Memorandum In Support, by mailing same, postage prepaid, to:

Robert B. Mann, Esq.
501 Turks Head Place
Providence, Rhode Island 02903

Paulette E. Camacho

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RAYMOND ANDERSON | ) | |
| | ) | |
| v. | ) | CA. No.05-015L |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

## I. INTRODUCTION

On January 9, 2001, the Defendant, Raymond Anderson ("Anderson"), pled guilty to conspiracy to commit carjacking and to aiding and abetting a carjacking that resulted in death. All four of his co-defendants, Gregory Floyd ("Floyd"), Harry Burdick ("Burdick"), Samuel Sanchez ("Sanchez"), and Kenneth Day ("Day") were also ultimately convicted by plea or by jury verdict for their various roles in this offense.[1] Floyd, Burdick, Sanchez, and Day were all sentenced to life without the possibility of parole. Anderson received a prison sentence of 30 years.[2]

On November 25, 2002, Anderson filed a notice of appeal challenging four aspects of his sentence. He alleged error in

---

[1] Day was convicted and sentenced in State Court.

[2] Anderson has since been convicted of committing an assault upon a federal officer for which he received a consecutive sentence of five years imprisonment.

the court's sentencing guideline calculations and the court's exercise of discretionary departure authority. On January 7, 2004, the First Circuit Court of Appeals affirmed Anderson's sentence concluding,

> "We need go no further. This was a horrific crime, demanding stern punishment. The District Court took its task seriously and approached the matter of sentencing with care. Because nothing in the record so much as hints that the Court committed reversible error in sentencing [Anderson], we affirm the judgments below."

United States v. Raymond Anderson, 354 F.3d 70, 83 (1st Circuit 2004). Anderson also sought certiorari to the United States Supreme Court which was denied. Anderson v. United States, 124 S.Ct. 2187, 158 L.Ed. 2nd 50, 72 U.S.L.W. 3711 (US May 17, 2004). He now timely petitions this Court for relief under 28 U.S.C. § 2255 alleging ineffective assistance of counsel.

Throughout the case, from charge to Writ of Certiorari, Anderson was ably represented by Robert B. Mann, Esq.[3] At trial Anderson was faced with overwhelming evidence of his guilt for a crime that carried a maximum punishment of death. Faced with an indefensible case, Mr. Mann offered Anderson's assistance to the government and negotiated a plea agreement sparing Anderson the possibility of the death penalty and securing for him the

---

[3] Prior to the government's decision not to seek the death penalty, Anderson was additionally represented by a second, court appointed, "death qualified counsel."

potential of a reduced sentence. In fact, of all the defendants, only Anderson was sentenced to less than life imprisonment. Mr. Mann secured that disposition by exercising sound judgment and the legal acumen gained through years of criminal trial experience in both the state and federal courts, including extensive experience as counsel in murder cases. Mr. Mann also pursued Anderson's appellate rights all the way to the United States Supreme Court.

Now with the desperation engendered by imprisonment, Anderson claims that his counsel was ineffective. Anderson enumerates 12 vague and unsupported complaints against his attorney. Most defy legal characterization and are therefore reprinted verbatim.

1. "Ineffective Assistance; Regarding 'Evidentiary Hearing'"
2. "Ineffective Assistance; 'Coerced Conviction'"
3. "Ineffective Plea"
4. "Ineffective Assistance; Regarding 'Preparation'"
5. "Ineffective Assistance; Regarding 'Status Hearing'"
6. "Ineffective Assistance; Regarding 'Withholding Information'"
7. "Ineffective Assistance; Regarding 'Indictment'"
8. "Ineffective Assistance; Regarding 'Appeal'"
9. "'State of Mind' During Pleading"
10. "'The Charge,' Conspiracy to Commit Car Jacking, Car Jacking Resulting in Murder"

11. "'Enhancement'"

12. "5K1 Rule; and Ineffective"

The United States maintains that Anderson was capably represented in the trial court, and before the First Circuit, and on Writ of Certiorari, by Mr. Mann. Anderson had an experienced, prominent, and well respected attorney who not only did everything he could to affectively represent Anderson, but actually succeeded in winning a lower sentence for Anderson than any of the other defendants. Lower, perhaps, than Anderson deserved. Anderson's vague and unsupported complaints about the abilities of his attorney fail to establish prejudice and do not justify relief under § 2255. The United States, therefore, requests that Anderson's petition be denied and dismissed.

## II. FACTS

### A. THE OFFENSE

Button Hole Park is now a golf course, but, in June of the year 2000 it was still under construction. At approximately 1:00p.m. on June 9, 2000, a construction supervisor found the bodies of Amy Shute and Jason Bergeson (sometimes referred to collectively as "the victims") near the perimeter of this site. The site, at that time, was being graded by earth movers and consisted primarily of sand and gravel. A section of the perimeter of the site was edged with hay bales. The area, particularly at night, was somewhat remote, desolate, and

inaccessible.

The bodies were found resting against hay bales. The body of Amy Shute was behind Jason Burgeson, her arms were around his body as if hugging him. A headband covered his eyes. The victims appeared to have been sitting or kneeling at the time they were shot, and then slumped over dying. In Amy Shute's left hand she had been clutching a diamond ring. Jason Burgeson had approximately $78 in cash concealed in his shoe. The bodies of the victims were covered in blood. Both had been shot in the head. Amy Shute was shot once. Jason Burgeson was shot twice. The entrance wounds were generally situated on the top or crown of the head. There were no exit wounds.

Amy Shute and Jason Burgeson were innocently socializing with friends in Downtown Providence on the night of their deaths. They visited various nightclubs, talked, laughed, and danced. They affirmed old friendships and began new ones. Amy Shute and Jason Burgeson were at least friends, but maybe more. There was the suggestion of a romantic relationship between the two.

While Amy Shute and Jason Burgeson were enjoying a summer evening, Floyd, Burdick, Sanchez, Day, and Anderson were prowling the streets of Providence in search of victims to rob. They made several unsuccessful attempts including another attempt to steal a car before spotting the victims and Jason Burgeson's sport utility vehicle, a Ford Explorer.

At the end of their evening, Amy Shute and Jason Burgeson were enjoying some quiet time alone. Whatever joy they were experiencing was shattered when Floyd racked a round of hollow point ammunition into the firing chamber of his high powered semi-automatic pistol. Then, he and Burdick ordered the two victims to get into their Explorer. In a moment, the victims found themselves kidnaped, at gun point, and riding in their commandeered truck.

The victims were driven to a desolate spot amid the sand and gravel formations of the Button Hole construction site. They were forced to sit helplessly and watch as their five captors searched through their car and rummaged through their personal belongings looking for valuables. Amy Shute was forced to remove her own jewelry and surrender it to this band of robbers. Before her death, Amy Shute endured the terror of listening to some of her assailants discuss the plausibility of raping her. Throughout their captivity, the victims continually inquired about their fate and pled for their lives while Floyd was being egged on by Sanchez and Day to slaughter them. Ultimately, Amy Shute and Jason Burgeson met their end, embracing each other, as they were executed in a final senseless, brutal, barbarous, and merciless act.

B. ANDERSON'S ROLE

Anderson's role in the offense of conviction is well established. On the evening of June 8, 2000, Day contacted Anderson to obtain his assistance in their criminal endeavors. Anderson agreed to participate and secured the assistance of Sanchez and the use of his car. Anderson and Sanchez met Day, Burdick, and Floyd in Downtown Providence. After collectively deciding to commit a robbery, they made several unsuccessful attempts, one of which included another carjacking.

Amy Shute and Jason Bergeson were identified as potential prey because they were vulnerable and because they had a desirable white SUV style truck. While Burdick and Floyd were carjacking the couple, Anderson waited with Sanchez and Day in Sanchez's car to provide either a means of escape if the carjacking failed, or to knowingly assist in further criminal activity.

Anderson remained with Sanchez and Day. After Floyd held up the victims, they were soon leading the way in Sanchez's car with full knowledge that they were now participating in an on going, armed carjacking with two kidnapped hostages. Followed by Burdick and Floyd who were holding the victims at gun point, they drove to the golf course construction site in Johnston. At the entrance, they abandoned Sanchez's car, and drove the Explorer further into the site. At times, Anderson rode fireman style on

the back bumper of the Explorer, evidencing his dogged determination to remain a participant in the crime. When they reached a suitably desolate area, Floyd, with Anderson's help, forced the victims out of the car. Anderson, then, took Amy Shute's jewelry from her just prior to her murder.

As the men debated their next move, only Burdick opposed killing the two victims. Anderson made no attempt to discourage Floyd from murdering the innocent couple. Day and Sanchez actively encouraged the murders to conceal their crime. After executing Amy Shute and Jason Bergeson, the men divided the money, using it to put gas in each of the motor vehicles.

Anderson was a knowledgeable and willing participant at each stage of the crime. He was present, participated and did not protest. Anderson was a partner in this pack of predators as they sought out prey throughout the entire evening. Anderson facilitated the brutal carjacking and unconscionable double murder by securing the involvement of Sanchez and the use of his car to commit the crime. He helped Floyd force the victims out of the car at the site of the murder. He helped keep the victims calm. At Floyd's direction, Anderson snatched the jewelry off of Amy Shute, as she kneeled awaiting her execution.

Given Anderson's substantially culpable role in the barbaric carjacking and double murder, he would have faced the same fate as his four co-defendants had it not been for the effective

assistance of his attorney. He should have no complaint.

III. LAW

A. The Law Governing Motions Under 28 U.S.C. § 2255

Section 2255 provides in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence is in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion under 28 U.S.C. § 2255 is a substitute for habeas corpus. Relief is available under this section only if the same relief is available under the writ. Hill v. United States, 368 U.S. 424, 427 (1962). The grounds justifying relief under § 2255 are limited. Section 2255 does not grant to a defendant the right to retry cases in which he had been adjudged guilty. Taylor v. United States, 177 F.2d 194, 195 (4th Cir. 1949).

In United States v. Addonizio, 442 U.S. 178, 184-85 (1979), the Supreme Court stated:

> It has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment . . . [u]nless the claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack has remained far more limited . . . . The Court has held that

> an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice' . . . . Similar limitations apply with respect to claimed errors of fact.

See also, Davis v. United States, 417 U.S. 333, 346 (1974).

A collateral attack may not do service for an appeal. United States v. Frady, 456 U.S. 152, 165 (1982); Dirring v. United States, 370 F.2d 862, 865 (1st Cir. 1967). To obtain collateral relief, a prisoner must clear a significantly higher hurdle than would exist on a direct appeal. The standard of review of a § 2255 motion for alleged trial errors to which no contemporaneous objection was made is not the plain error standard, but the cause and actual prejudice standard. Frady, 456 U.S. at 166-67. A defendant cannot raise in a federal habeas proceeding issues which he failed to raise at trial or on direct appeal absent a showing of cause for the failure and a showing of prejudice. Knight v. United States, 37 F.3d 769, 774 (1st Cir. 1994).

B. The Law Governing The Entitlement To A Hearing

Section 2255 provides that the court should hold a hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." Rule 4 of the rules governing Section 2255 proceedings for the United States District Courts provides in pertinent part that

[i]f it plainly appears from the face of the motion and any

annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified. The burden is on the movant to provide by a preponderance of the evidence that he is entitled to a hearing. Myatt v. United States, 875 F.2d 8, 11 (1st Cir. 1998). In considering a motion under § 2255, the district court should accept the movant's allegations as true "except to the extent they are contradicted by the record, inherently incredible, or conclusions rather than facts." United States v. Mosquera, 845 F.2d 1122, 1124 (1st Cir. 1988).

The First Circuit has stated that no hearing is required where the § 2255 motion: (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case." Moran v. Hogan, 494 F.2d 1220, 1222, (1st Cir. 1974); United States v. Carbone, 880 F.2d 1500, 1502 (1st Cir.), cert. denied, 493 U.S. 1078 (1990). Moreover, the First Circuit has also held that "no hearing is required where the district judge is thoroughly familiar with the case." Ouellette v. United States, 862 F.2d 371, 377 (1st Cir. 1988); Panzardi-Alvarez v. United States, 879 F.2d 975 n.8 (1st Cir. 1989). A district judge's personal observation and recollection of the events at trial may supplement the record. Gregory v. United States, 585 F.2d 548,

550 n.1 (1st Cir. 1978); United States v. DiCarlo, 575 F.2d 952, 954-955 (1st Cir. 1978).

In the instant case, no evidentiary hearing is required because all Anderson's claims can be resolved by reference to the record, and where the record does not exist, by relying on the knowledge and memory of the sentencing judge. Gregory, 585 F.2d 548, 550 n.1; DiCarlo, 575 F.2d 952, 954-955. Portions of the record necessary to decide this motion include (1) a copy of the plea agreement (exhibit 1); (2) the transcript of the plea hearing (exhibit 2); (3) the transcript of the sentencing hearing (exhibit 3) and; (4) a letter to the court dated October 7, 2002 enclosing a summary of a psychiatric examination of Anderson (exhibit 4).

C. The Law Applicable To An Ineffective Assistance Claim

In considering the issue of effective representation, the District Court must first identify the acts or omissions of counsel. The Court should then determine whether these acts or omissions were outside the wide range of professionally competent assistance and, if so, whether the error affected the judgment. Strickland v. Washington, 466 U.S. 668 (1984). Counsel's representation must fall below an objective standard of reasonableness, and the defendant must show prejudice. Ouellette v. United States, 862 F.2d 371, 376 (1st Cir. 1988); see also United States v. McGill, 11 F.3d 223 (1st Cir. 1993). There must

be a reasonable probability that, but for the attorney's unprofessional errors, the result would be different. Scarpa v. Dubois, 38 F.3d 1 (1st Cir. 1994). There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. Singleton v. United States, 26 F.3d 233 (1st Cir. 1994); United States v. Moreno Morales, 815 F.2d 725, 751 (1st Cir.), cert. denied, 484 U.S. 966 (1987). The effective assistance of counsel standard does not require the "useless charade" of presenting a meritless defense. United States v. Cronic, 466 U.S. 648, 656 n.19 (1984). Counsel need not jump through every conceivable hoop, or engage in futile exercises. Singleton, 26 F.3d at 239. The defendant is entitled to an effective defense, not a perfect one nor a successful one. Scarpa, 38 F.3d at 8. The attorney's judgment need not be right so long as it is reasonable. McGill, 11 F.3d at 227. A reviewing court should not use the benefit of hindsight to second-guess tactical decision made by an attorney unless the decisions are unreasonable. Perron v. Perrin, 742 F.2d 669, 673 (1st Cir. 1984).

IV. ARGUMENT

Anderson cites twelve (12) instances in which he claims his counsel was ineffective. All are legally and factually unsupported. After all, even Anderson said, under oath, that he was fully satisfied with the counsel, representation and advice

given to him in this case by Mr. Mann. (exhibit 2 at 5). Most of Anderson's complaints defy any legal characterization or reasoned legal analysis and are difficult to address.[4] All Anderson's grounds appear to be worthy of summary dismissal. They will be addressed seriatim.

A. <u>"Ineffective Assistance; Regarding "'Evidentiary Hearing'"</u>

Anderson explains his first claim by stating,

> "It was never brought, to my attention, what the state, had on me. But my attoney, gave the perception, that the state held vital information. Which come to find out, they didn't. I would of never plead out, if I knew, or was told."

Presumably by "state," Anderson is referring to the United States Government. In any event, the state and federal governments jointly investigated this case and so the evidence to which Anderson refers is the same whether held by the State of Rhode Island or by the United States of America.

Anderson never identifies a weakness in the government's case. He therefore never identifies a weakness that his counsel failed to exploit and so he has provided no information upon which the Court can find that counsel's conduct

---

[4] Due to the difficulty in characterizing Anderson's allegations in legal terms, the United States has simply quoted his own elucidations repleat as they are, with misspellings, grammatical and punctuation errors without resort to the use of the designation "sic" for each of the many mistakes, as too numerous and distracting.

fell below an objective standard of reasonableness. Even if Anderson had identified the evidence, or lack thereof, he could not establish prejudice because a conviction was all but assured by the weight of the evidence and by pleading guilty he received a substantially reduced sentence.

The reference to "evidentiary hearing" is otherwise unenlightening. It is unclear whether Anderson claims that he had a suppression issue, motion to dismiss or some other pretrial matter that he wished to be heard on. The United States cannot further respond.

Anderson's vague and imprecise challenge fails to identify a ground upon relief can be granted. It does not establish substandard legal assistance nor any prejudice resulting therefrom. This complaint should therefore be denied and dismissed.

B. <u>"Ineffective Assistance; 'Coerced Conviction'"</u>

Anderson explicates his dissatisfaction by stating,

> "The lack of knowledge, via dealings with federal law, or law period, left me vunerable. An instead of my counsel, using his knowledge, to help; he painted a picture, as though, my best intrest, or only option, was to plead out."

Anderson seemingly claims that counsel did not fully explore his legal options including his right to trial. Even if Anderson's allegation were true, which the government does not concede, Anderson's assertion is belied by the record in this

case. The very terms of his plea agreement spell out all of his trial rights. (Exhibit 1 at 4-5). Anderson signed the agreement. (Exhibit 1 at 7). At his plea hearing, Anderson told the court that, before signing it, he "read every word of it" and that he "thoroughly" discussed it with counsel (exhibit 2 at 9). Each of Anderson's rights were carefully explained to him again by the Court before he pled guilty (exhibit 2 at 14-15). Indeed, as no defendant escaped either federal or state conviction and only Anderson received a reduce sentence, it appears that his attorney's recommendation to sign the agreement and to plead guilty was sound advice. Anderson has neither identified a fault nor established prejudice.

C. <u>"Ineffective Plea"</u>

In his third complaint, Anderson again makes a vague and totally unsupported allegation claiming,

> "I never agreed to testifing, under the rules given; not knowingly. I was placed on the news, newspapers, as testifing."

Anderson's assertion is contradicted by the record. The terms of the plea agreement that he signed, which he "read every word of," and "thoroughly" discussed with his lawyer, clearly specify his agreement to testify (exhibit 1 at 1). That agreement was confirmed at his plea hearing (exhibit 2 at 6-9).

This complaint also suffers from a failure to identify any substandard advice or resulting prejudice. That Anderson's

testimony in this highly publicized trial was subject to media attention should come as no surprise to him. Furthermore, as bad and as ineffective as Anderson's testimony at trial actually was, he was rewarded for it by a significantly reduced sentence. His rights under the agreement were diligently guarded by his attorney and scrupulously honored by the United States.

Anderson once again fails to state a claim upon which relief can be granted. The request should be denied and dismissed.

D. "Ineffective Assistance; Regarding 'Preparation'"

This claim, more than any of the others establishes the folly of the basic premise underlying all of Anderson's many frivolous assertions. He clarifies this gripe by stating,

> "The lawyer in question, never handled a Federal case, let allow a Federal Murder case! So there forth, he isn't equipped in handling, such a matter."

The government maintains that the Court may take judicial notice of the fact that Robert B. Mann, Esq., has regularly appeared in federal and state criminal matters including murder cases. Fed. R. Evid 201. Rule 201(b) and (f) of the Federal Rules of Evidence permits judicial notice of facts "at any stage of the proceeding", that are, "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources

whose accuracy cannot reasonably be questioned."

Mr. Mann has enjoyed a long and successful career in which he has established an impeccable reputation. He is among the preeminent criminal defense lawyers in the state. His level of experience is virtually second to none.

Anderson signed his § 2255 petition under oath, subject to the penalties of perjury. Anderson's assertion of facts, which are patently false, is demonstrative of the total reckliness and lack of candor in all of his claims.

As a legal matter, even if Mr. Mann were inexperienced, Anderson, fails to identify any deficiency in his performance or prejudice to his case that would allow the court to entertain any form of relief.

E. "Ineffective Assistance; Regarding 'Status Hearing'"

Anderson expounds,

> "I wasn't fully kept, abreast of the proceedings, Motions, arguments; were never heard; he accepted everything from prosecution."

Anderson was present for all court proceedings. It is difficult to imagine which proceedings, motions, and arguments, of which he was not kept abreast. Seemingly, he means to assert that motions and arguments were not made but he fails to identify any motion or argument that he wanted made. The government is unable to further address this contention and the court is unable

to grant relief on this unspecified complaint because it does not identify a substandard practice or any resulting prejudice. This ground should be dismissed as well.

F. "Ineffective Assistance; Regarding 'Withholding Information'"

Anderson inartfully explains,

> "Never has he, made point to argue, my charge, or talk about the evidence concearning myself. My lawyer never told me the pro's & con's of this case only the con's."

Here Anderson seemingly claims that he was unaware of the evidence establishing his guilt. Once again without conceding any deficiency on counsel's part, it is clear from the record that, at his plea hearing and sentencing hearing, Anderson was fully informed of the facts and circumstances that supported his guilty plea and his sentence (exhibit 2 at 15-22 and exhibit 3 throughout). In fact, Anderson brought two factual contentions to the Court's attention (exhibit 2 at 22-24).

Concerning the broad allegation that his attorney never argued his case, that assertion is contradicted by the entire record of the plea and sentencing hearings in which his counsel pressed several arguments which were then appealed to the First Circuit and were pursued on Writ of Certiorari to the Supreme Court.

Anderson's nonspecific and unsupported allegation is both belied by the record and identifies no resulting prejudice.

This ground should also be denied.

G. "Ineffective Assistance; Regarding 'Indictment'"

Anderson asserts,

> "From the beginning, the statements, the charge, the intent, even to my state of mind; was never trully argued. I've plead to charges, that never fit me."

Anderson's broad and unsupported allegations are again not supported by the record. Even if counsel failed to consult with Anderson, a fact that is not conceded, the record in this case demonstrates that there was no prejudice because Anderson was completely apprised of the nature of the charges on the record in open court.

At his plea hearing, the elements and the law related to those elements were all carefully explained to him (exhibit 2 at 15-18). Additionally, the facts supporting his conviction were are laid out for Anderson (exhibit 2 at 18-22). Anderson admitted those facts under oath (exhibit 2 at 24) and entered a plea of guilty. Id. The facts underlying Anderson's guilt were again scrutinized at sentencing and Anderson's attorney actually argued his lack of intent in a bid to get him a downward departure. (see, e.g., exhibit 3 at 13-17). Mr. Mann also characterized Anderson's role as minor and sought an appropriate guideline adjustment. (See, e.g., exhibit 3 at 12-13).

Anderson's allegations are unsupported by the record, fail to identify any legal grounds for redress, and should be denied.

H. "Ineffective Assistance; Regarding 'Appeal'"

Anderson weakly illuminates this grievance,

> "If motions, were placed before hand, like I've asked, as far as, protection etc; I believe things to be differently. As well as, if I had an effective counsel, he wold of seen, my previous lawyer, was ineffective, and wold of place a motion."

Anderson does not identify a motion that he asked to be made that was not made. He does not identify resulting prejudice. His complaint seems to indicate that such a motion would have related to witness protection ("as far as, protection etc.; . . ."). Such a motion would have had nothing to do with his guilt or his sentence and is therefore irrelevant to this proceeding. Anderson further grumbles that, ". . . if [he] had an effective counsel, he wold of seen, my previous lawyer, was ineffective, and wold of place a motion." The asseveration simply makes no sense because Anderson had one lawyer continuously through the trial and appellate phase of this case.

Once again, because Anderson identifies no substandard performance nor any resulting prejudice and because his issue does not appear to relate to guilt or punishment, this complaint should be dismissed.

I. <u>"'State of Mind', During Pleading"</u>

Anderson's discontent is stated,

> "I've just had my first child, my first time in jail, for a crime, I didn't commit, as well as facing death, during turning of age. There is no way, I could be in a stable mind frame pleading out."

Although Anderson now claims that he didn't commit a crime, at his plea hearing, after all his rights, the law and the facts were explained to him, he admitted under oath that he had committed this crime (exhibit 2 at 24). He does not identify any factual or legal deficiency in his conviction nor does he proffer a theory of defense. He merely makes a self-serving assertion that he didn't commit this crime when he previously admitted his guilt and was sentenced accordingly.

To the extent that this complaint raises a question concerning his mental stability, he denied any mental illness at the plea hearing (exhibit 2 at 5). Besides Anderson's hopeful speculation that, "There is no way, I could be in a stable mind frame pleading out." There is nothing to support his self-serving assertion that he was mentally incompetent to enter a plea. Indeed, neither defense counsel, the prosecutor, nor the Court could discern any problem with his mental stability at any

stage of the proceeding or a competency examination would have been ordered. Furthermore, in an effort to win a sentencing departure his attorney had Anderson examined by Dr. Ronald Steward and reported the Doctor's findings to the Court (exhibit 4).

Once again Anderson fails to state a claim upon which relief can be granted and this complaint should be denied.

J. "'The Charge,' Conspiracy To Commit Carjacking, Carjacking Resulting in Murder"

Here Anderson merely restates his own new found misunderstanding of the nature of his conviction. He rationalizes,

> "I've never conspirerd, nor, thought, or knew, someone was going to, get killed. Everytime I mentioned, I tried to stop it, it was always never enough, in everyones eyes. But I never carjacked anyone, expecially resulting in death."

Anderson was not convicted of being a principal in the carjacking murders. He merely conspired to commit as well as aided and abetted the crime. The facts and the law were explained to him at his plea hearing and he admitted to those facts and to his guilt under these theories of vicarious liability. There has been no credible evidence in the course of two trials of this matter to suggest that Anderson "tried to stop it . . . "

Anderson aided and abetted this carjacking by recruiting accomplices and securing the get-away car; by supporting it with his presence and willingness to assist; by helping to remove the victims from their motor vehicle; by keeping them calm with false hope that they were not in jeopardy; by helping Floyd steal jewelry from Amy Shute just prior to her execution; and by generally sharing in the proceeds of the crime.

As this complaint neither identifies a deficiency in his attorney's performance or any resulting prejudice, it does not support the defendant's petition and should be denied.

K. "Enhancement"

In his eleventh ground, Anderson reasons,

> "I was enhanced, because I'm not guilty, of the charge. So thereforth I was enhanced."

Here, in addition to creating a syllogistic non-sequitur, Anderson is merely confusing guidelines sentencing concepts with his recently developed sense of innocense. The complaint really requires no further analysis as it is totally without basis in law or fact and neither identifies any deficient performance or resulting prejudice. It should therefore be dismissed.

L. "5K1 Rule; & Ineffective"

Anderson appears to be unsatisfied with the level of protection he is receiving. To explicate his discontent, he

states,

> "I've asked for protection, I've asked for to be kept out of the newspaper (media) my life been placed in danger."

As this complaint has nothing to do with Anderson's guilt or sentence, it is irrelevant to this petition and should be denied.

V. CONCLUSION

None of Anderson's many generalized complaints about the efficacy of his attorney identify any actionable deficiency nor any resulting prejudice. Anderson's motion pursuant to 28 U.S.C. § 2255 should be summarily denied and dismissed.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

Gerard B. Sullivan

GERARD B. SULLIVAN
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that on this 14th of March 2005, I served a copy of the within Government's Motion to Its Objection to Defendant's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody, with Accompanying Memorandum In Support, by mailing same, postage prepaid, to:

Robert B. Mann, Esq.
501 Turks Head Place
Providence, Rhode Island 02903

Paulette E. Gamache

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CR. No. |
| | : | |
| RAYMOND ANDERSON | : | |

**PLEA AGREEMENT**

Pursuant to Rule 11(e)(1)(B) of the Federal Rules of Criminal Procedure, the United States and Defendant, RAYMOND ANDERSON, have reached the following agreement:

1. Defendant will plead guilty to the Indictment which charges conspiracy and carjacking resulting in death. 18 U.S.C. §§ 2, 371, and 2119(3) .

2. Defendant further agrees, upon execution of this agreement, to cooperate with the United States as follows:

a. He will meet with government representatives as often as necessary and provide complete and truthful information to them.

b. He will appear and testify fully and truthfully in any and all legal proceedings, including, but not limited to, grand jury, trial, re-trial, and sentencing proceedings.

3. Defendant understands and agrees that any and all statements, information, and testimony he provides must at all

times be complete and truthful. If, at any time, he wilfully provides any false statement, information, or testimony, he shall be subject to prosecution for doing so, including but not limited to prosecution for making a false statement, obstruction of justice, and perjury.

4. In exchange for Defendant's plea of guilty:

a. The government agrees not to seek the death penalty.

b. The government will recommend that the Court impose a term of imprisonment from within the range of sentences for the offense level determined by the Court under the United States Sentencing Guidelines (the "guidelines"). There is no agreement as to which guideline offense level applies, including any adjustments or departures that may apply to the Defendant's case. Both the Defendant and the government reserve their right to argue or present evidence on sentencing guideline issues. The Defendant understands that the government is free to recommend any sentence from within the resulting guideline range, including the longest sentence permitted in that range.

c. For purposes of determining the offense level, the government agrees to recommend a 3 level reduction in the offense level for acceptance of responsibility under §3E1.1 of the guidelines.

d. The government is free to recommend any combination of supervised release, fines, and restitution which it deems appropriate.

e. If the government, in its sole discretion, determines that Defendant has provided substantial assistance to the government in the investigation or prosecution of another person, the government will file a motion under §5K1.1 of the guidelines asking the Court to impose a sentence below the guideline sentencing range or any applicable statutory minimum sentence. Defendant understands that the decision whether to file such a motion is solely up to the United States Attorney's Office and the decision whether, and to what extent, to grant it is solely up to the Court. Defendant further understands that any assistance and cooperation he has provided prior to the date of this agreement will be considered by the government in making the decision whether to file such a motion. Defendant also understands, however, that the statements and testimony he has provided prior to the date of this agreement are not sufficient, standing alone, to cause the government to file the motion. The government has not made any promise or representation about what sentence it will recommend if it files such a motion or what sentence the Court will impose.

5. The maximum statutory penalties for the offenses to which Defendant is pleading are as follows:

Count 1

a. 5 years imprisonment;

b. a fine of up to $250,000 or twice the amount of the gain or loss from the offense, whichever is greater;

c. a term of supervised release of up to 3 years; and

d. a mandatory special assessment of $100; and

Count 2

a. life imprisonment or death;

b. a fine of up to $250,000 or twice the amount of the gain or loss from the offense, whichever is greater;

c. a term of supervised release of up to 5 years; and

d. a mandatory special assessment of $100.

6. Defendant agrees that, after he and his counsel sign this agreement, counsel will return it to the United States Attorney's Office along with a money order or certified check, payable to the Clerk, United States District Court, in payment of the special assessment.

7. Defendant understands that he has the following rights:

a. to be represented by an attorney at every stage of the proceedings against him;

b. to persist in a plea of not guilty;

c. to be tried by a jury;

d. to have counsel assist him in that trial;

e. to confront and cross-examine the witnesses against him;

f. to call witnesses on his own behalf; and

g. to testify on his own behalf, if he wishes, but also a right against self-incrimination and that he, therefore, could not be forced to testify.

Defendant further understands that, by pleading guilty, he gives up his right to a trial and that, by answering the Court's questions, he also gives up his right not to incriminate himself.

8. The government reserves its full right of allocution, including the right to present any information to the Court for its consideration in fashioning an appropriate sentence, the right to correct misstatements, misrepresentations, or omissions by Defendant, and to answer any questions asked by the Court.

9. Except for paragraph 4, above, the parties have made no agreement concerning the application of the guidelines in this case.

10. Defendant understands that the Court alone makes all sentencing decisions, including the application of the guidelines and the sentence to be imposed. The Court is not bound by the government's recommendations and is free to impose any sentence

it deems appropriate up to and including the statutory maximum. Defendant also understands that, even if the Court's guideline determinations and sentence are different than he expects, Defendant will not be allowed to withdraw his plea of guilty.

11. This agreement is binding on the government only if Defendant pleads guilty, fulfills all his obligations under the agreement, does not engage in any conduct which may constitute obstruction of justice under §3C1.1 of the guidelines, does not commit any new federal, state, or local offenses, and does not otherwise violate the terms of his release or detention pending sentence. Defendant understands that if he violates this agreement in any way, the government shall be released from its obligations under the agreement and will be free to make any recommendations that it deems appropriate. In the event of any such violation, Defendant shall have no right to withdraw his guilty plea.

12. This agreement is limited to the District of Rhode Island and does not bind any other federal, state, or local prosecutive authorities.

13. This agreement constitutes the entire agreement between the parties. No other promises or inducements have been made concerning the plea in this case. Defendant acknowledges that no person has, directly or indirectly, threatened or coerced him to enter this agreement. Any additions, deletions, or modifications

to this agreement must be made in writing and signed by all the parties in order to be effective.

14. Counsel for Defendant states that he has read this agreement, been given a copy of it for his file, explained it to his client, and states that to the best of his knowledge and belief, Defendant understands the agreement.

15. Defendant states that he has read the agreement or has had it read to him, has discussed it with counsel, understands it, and agrees to its provisions.

RAYMOND ANDERSON
Defendant

12/20/00
Date

ROBERT B. MANN, Esquire
Counsel for Defendant

12/20/00
Date

GERARD B. SULLIVAN
Assistant U.S. Attorney

December 20, 2000
Date

CRAIG N. MOORE
First Assistant U.S. Attorney

12/20/2000
Date

(2)



UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * *

UNITED STATES OF AMERICA C.R. NO. 2000-141 L

VS. PROVIDENCE, R.I.
9 JANUARY 2001

RAYMOND ANDERSON

* * * * * * * * * *

BEFORE DISTRICT JUDGE RONALD R. LAGUEUX

APPEARANCES:

FOR THE GOVERNMENT: GERARD B. SULLIVAN, ESQ.
U. S. Attorney's Office
FLEET CENTER
50 KENNEDY PLAZA 8TH FLOOR
Providence, RI 02903
528-5477

FOR THE DEFENDANT: ROBERT B. MANN, ESQ.
501 Turks Head Place
Providence, RI 02903
351-5770

Court Reporter: JOSEPH A. FONTES
Two Exchange Terrace
Providence, RI 02903
401-273-0344

Proceeding reported and produced by computer-aided stenography

JANUARY 9, 2001 - AFTERNOON SESSION

THE COURT: Good afternoon, everyone. As the result of a conference in chambers, the case of the United States of America versus Harry Burdick, Criminal Action 2000-141 L, is continued to 2 o'clock Friday afternoon. Is Anderson ready to proceed at 2:30?

MR. SULLIVAN: If Mr. Mann is here. I haven't seen him yet.

THE COURT: I'm sorry?

MR. SULLIVAN: If Mr. Mann -- oh, Mr. Mann is here. Yes, we're ready to proceed.

THE COURT: You're ready to proceed with Anderson at 2:30?

MR. MANN: I am, your Honor. I would ask for a moment just to speak to Miss Ciresi, Judge, or Mr. Sullivan.

THE COURT: All right. We'll take a recess.

(RECESS)

THE COURT: Good afternoon, everyone. The matter before the Court is criminal action 2000-141 L, United States of America versus Raymond Anderson. The matter is here for change of plea. Will the attorneys identify themselves for the

record?

MR. SULLIVAN: Gerard B. Sullivan for the United States.

MR. MANN: Robert Mann for the defendant Raymond Anderson.

THE COURT: The record will indicate the defendant is present.

(Defendant present)

THE COURT: Is the defendant ready to change his plea, Mr. Mann?

THE COURT: Yes.

THE COURT: All right. You go up to the microphone there, Mr. Anderson, and the Clerk will administer the oath to you. Go right up to that microphone right there.

THE CLERK: Please raise your right hand. Please state your name and spell your name for the record.

THE DEFENDANT: My name is Raymond Anderson, R-A-Y-M-O-N-D A-N-D-E-R-S-O-N.

(Defendant sworn)

THE CLERK: You may put your hand down.

EXAMINATION BY THE COURT:

Q. Mr. Anderson, you realize now you're under oath and you'll have to make true answer to any questions

I ask of you?
A. Yes.
Q. And if you make any false answers, you could be prosecuted for perjury. You understand that?
A. Yes.
Q. How old are you?
A. 19.
Q. And how far did you go in school?
A. Tenth grade. Tenth, eleventh.
Q. Where?
A. At Hope.
Q. Between the 10th and 11th?
A. Yeah. It was at Hope High School.
Q. You haven't completed high school?
A. No. No, your Honor.
Q. What type of work have you been doing?
A. Well, as far as -- well, my last recent job I've completed was Census Bureau 2000, and just other jobs. Seasonal jobs, basically.
Q. What kind of seasonal jobs?
A. I worked at St. Joseph's Hospital as an occupational therapist. I worked at the Human Resources Department doing clerical work. I worked for the lunches. I worked at APC. You know, that's basically it.

Q. All right. Have you been treated recently for any mental illness or addiction to narcotic drugs of any kind?
A. No, your Honor.
Q. Are you currently under the influence of any drug or medication or alcoholic beverage of any kind?
A. No, your Honor.
Q. Have you received a copy of the indictment which sets forth the written charges against you in this case?
A. Yes, your Honor.
Q. And have you discussed those fully with your counsel, Mr. Mann?
A. Yes, your Honor.
Q. Are you fully satisfied with the counsel representation and advice given to you in this case by your attorney Mr. Mann?
A. Yes, your Honor.
Q. Is your willingness to plead guilty to these charges the results of discussions that you had with your attorney?
A. Yes, your Honor.
Q. And also the results of discussions that your attorney had with the attorney for the Government, is that correct?

A. Yes, your Honor.

THE COURT: Now there's a plea agreement in this case. I'd like the prosecution to set forth what the essential terms of the plea agreement are. Listen carefully to this, Mr. Anderson, because then I will ask you whether this is your understanding of the agreement you have with the Government. Mr. Sullivan.

MR. SULLIVAN: Your Honor, there is a written non-binding plea agreement in this case. It is on file and I incorporate the terms of that document by reference.

The defendant has agreed to plead guilty to one count of conspiracy to commit carjacking and one count of carjacking resulting in death, in violation of 18 United States Code, Sections 2, 371 and 2119(3). He also agreed to cooperate fully and truthfully with the Government's investigation of this matter.

In exchange for the defendant's plea of guilty, and his truthful cooperation, the United States has agreed not to seek the death penalty in this matter. The Government has also agreed to make a recommendation of a sentence within the guideline range. The defendant understands that the United

States is free to recommend any sentence including the longest sentence available. There is no agreement as to which guideline range applies, including any adjustments or departures to be made either upwards or downwards to the guidelines. In effect, the United States and the defendant reserve their right to argue or present evidence on any guideline issue without limitation except that the defendant is entitled to a three point reduction for acceptance of responsibility by entering his plea. There is no agreement as to fines or supervised release, or restitution to be applied in this matter. The agreement also calls for the possibility of a substantial assistance motion filed by the Government. The defendant understands that that is a mere possibility at this point. The defendant understands that the decision whether or not to file that motion rests exclusively with the United States Attorney's office. The defendant understands that the statement and testimony given prior to the signing of that agreement is not sufficient standing alone to cause the Government to file such a motion. The defendant further understands that if the motion is made by the Government, there is no promise as to what the Government's recommendation for sentence

will be in this case. The defendant understands that if the motion is made, there is no guarantee that the Court will grant that motion and give the defendant any reduction whether or not the Government recommends one. The defendant understands that if the Government makes the motion, and the Court grants the motion, that there is no promise as to what sentence the Court will ultimately impose. The defendant finally understands that the entire agreement is not binding, and that the Court can sentence the defendant up to the statutory max, which in the absence of capital punishment would be life imprisonment. The defendant understands that parole has been abolished, and that if such a sentence is imposed, he would be incarcerated for the rest of his natural life. Because this is a non-binding plea agreement, the defendant finally understands that regardless of any sentence ultimately imposed by the Court, whether or not it meets his expectations, he will have no right to withdraw his guilty plea. Thank you.

THE COURT: Did you recite the maximum statutory penalties under the plea agreement?

MR. SULLIVAN: Your Honor, Count I is 5 years incarceration, $250,000 fine, 3 years of

supervised release, and a $100 special assessment. Count II, by statute, is life imprisonment, up to life imprisonment, or death, without the filing of a notice. Obviously the maximum is life imprisonment. $250,000 fine, 5 years of supervised release, and $100 in special assessments. If imposed consecutively, that would total life plus 5 years, $500,000, 5 years of supervised release, and $200 in special assessments. Thank you.

Q. Did you hear all of that, Mr. Anderson?

A. Yes, your Honor.

Q. And is that your understanding of the agreement you have with the Government?

A. Yes, your Honor.

Q. I notice that you signed this plea agreement on December 20, 2000, is that correct?

A. Yes, your Honor.

Q. And before signing it, did you read it?

A. Yes, your Honor.

Q. You read every word of it?

A. Yes, your Honor.

Q. And did you discuss it with your attorney, Mr. Mann?

A. Thoroughly, your Honor.

Q. And after discussing it thoroughly, you agreed

to sign this agreement?
A. Yes, your Honor.
Q. And is this your voluntary act?
A. Yes, your Honor.
Q. Other than this plea agreement, are there any other promises or assurances made to you to induce you to plead guilty in this case?
A. No, your Honor.

MR. SULLIVAN: Your Honor, I am aware that yesterday there was some communication between defense counsel and the Rhode Island Department of Attorney General which resulted in the issuance of a letter from the Attorney General's office that simply provides in its essence that if the defendant is convicted and sentenced in the federal system, that the State of Rhode Island won't pursue its charges provided that substantial justice is obtained in federal courts. There is no definition as to what substantial justice is, but there is that letter in place.

THE COURT: Mr. Mann, do you agree with that?

MR. MANN: I agree, and that letter -- we reviewed that letter before coming into court today, we meaning Mr. Anderson and myself.

THE COURT: You consider that part of the plea agreement?

MR. MANN: I thought it important it be brought to the Court's attention, yes, your Honor, even though paragraph 12 of the plea agreement specifically says that the state authorities are not bound -- no other authorities in the District of Rhode Island are bound by this agreement. I think it was significant to bring out this exchange of letters between my office and Attorney General Whitehouse.

MR. SULLIVAN: To me it's a promise of an inducement to the defendant.

THE COURT: It's an additional promise?

MR. SULLIVAN: Yes.

THE COURT: All right.

Q. Other than that promise, Mr. Anderson, have you received any other promises in this matter?

A. No, your Honor.

Q. Has any type of coercion or duress been exercised on you to try to force you to plead guilty in this case?

A. No, your Honor.

Q. All right. Now I presume that you discussed the guidelines with Mr. Mann, is that correct?

A. Yes, your Honor.

Q. And you understand that the maximum sentences that could be imposed by law are simply that, the maximum sentences, but that doesn't have anything to do with calculating the guidelines and applying the guidelines in this case. You understand that?
A. Yes, your Honor.
Q. Do you have some idea of where the guidelines are going to come out in your case now based on your discussions with Mr. Mann?
A. No, your Honor.
Q. You hope it's something less than life imprisonment, I take it?
A. Yes.
MR. MANN: I think he may have misunderstood the question. He clearly has some idea, Judge.
THE COURT: All right.
A. Well, right now I don't. Yeah, I have some idea somewhat, but --
Q. You understand right now that it's all a guess, and it's all an estimate. You understand that?
A. Yes.
Q. Let me explain the procedure that we'll be following so that you understand it perfectly. I will order a presentence report if I accept your plea

of guilty today. Probation will produce that presentence report. It will tell me all about you, it will tell me all about this crime. You'll get a copy of it. You'll be able to go over it with your attorney. If there's anything in there that you think is inaccurate or wrong, you can object to it. Then we'll have a sentencing hearing. At the sentencing hearing, the Government will be able to argue, your lawyer will be able to argue, you'll be able to address the Court, and then I'll make a determination of what the guideline range is in your case, applying the law as I understand it. You understand all that?

A. Yes, your Honor.

Q. You understand that the Government may file a motion. If you substantially cooperate with the Government, it may file a motion for a downward departure from those guidelines. You understand that?

A. Yes, your Honor.

Q. Now you understand that that's entirely up to the Government. The Government has complete discretion on whether to file that motion or not. You understand that?

A. Yes, your Honor.

Q. And if the Government files the motion, then I have discretion as to whether to grant it, and if I do grant it, to what extent I grant it. You understand all that?
A. Yes, your Honor.
Q. Now you understand that you're pleading guilty to two serious felonies here, conspiracy and also to carjacking with death resulting, and that may have some collateral consequences. You may lose certain civil rights such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess any kind of firearm. You understand that?
A. Yes, your Honor.
Q. Now you understand that you have a right to plead not guilty to these two charges, and to have a trial before the Court sitting with or without a jury. You understand that?
A. Yes, your Honor.
Q. And if you had a trial, you'd have certain rights that are incidental to a trial, such as, you would be presumed innocent; the Government would have to prove you guilty beyond a reasonable doubt; you would have the right to the assistance of counsel in your defense; you'd have the right to see and hear

all the witnesses and have them cross-examined in your defense; you'd have the right on your own part to decline to testify unless you voluntarily elected to do so in your defense; and you'd have the right to the issuance of subpoenas to compel the attendance of witnesses to testify in your defense. You understand if you had a trial you'd have all those rights?

A. Yes, your Honor.

Q. And do you further understand by entering a plea of guilty, if your plea is accepted, there will be no trial, and you will have given up all those rights that are incidental to a trial?

A. Yes, your Honor.

Q. You understand that?

A. Yes.

THE COURT: Now I'd like the Government to set forth what the Government would prove in this case if it went to trial. I want you to listen very carefully to this, Mr. Anderson, because then I'm going to ask you whether these are the facts in your case.

MR. SULLIVAN: Your Honor, the defendant is charged with conspiracy with carjacking resulting in death, and with aiding and abetting those offenses. In order to establish those offenses for

the crime of conspiracy, the Government must prove three elements:

First, that the agreement specified in the indictment existed between at least two people. The agreement can be spoken or unspoken, and the Government must prove that the defendant shared a general understanding of the crime, although not all the details.

Second, the Government must prove that the defendant willfully joined in that conspiracy. Willfully means voluntarily and intelligently, that is to say with a bad purpose, either to disobey or to disregard the law, not by ignorance or by accident or by mistake. Mere presence is not enough. The Government must show two types of intent, an intent to agree and intent to commit the underlying crime, in this case carjacking.

The Government must further show that one co-conspirator committed one overt act. The Government does not have to prove that the defendant personally committed that act, or that he even knew that it happened, simply that one of his co-conspirators did commit an overt act.

For carjacking resulting in death, the Government must establish four elements.

First, the taking of a motor vehicle from a person or presence of another. Taking means to acquire control. Presence means from the victim, or from the victim with the motor vehicle sufficiently within his reach or observation.

The second element is force or violence or intimidation. The Government can establish this element either by showing proof of actual force or violence, and in this case the victims were murdered, or by intimidation, and that means that a defendant said or did something that would make an ordinary person fear bodily harm.

The Government must, third, prove an intent to cause death or serious bodily injury. The Government must prove that when the defendant took control of the vehicle, he intended death or serious bodily injury, if necessary, to steal the car, or for any other reason.

Finally, the Government has to prove that the motor vehicle traveled in interstate commerce at some point since its manufacture and moved across the state line, not the defendant moved it across the state line or even knew that it passed in interstate commerce.

Finally, and perhaps most significantly

for this defendant, he is charged as an aider and abettor of these offenses. Aiding and abetting means to intentionally help someone else commit a crime.

First, the Government must show that someone else committed all the elements of the crime; and second, that this defendant willfully associated himself in some way with that crime, and participated in it, as something he wished to bring about. The defendant need not perform the underlying criminal act, be present when it's performed, or be aware of all the details. And once again, mere presence is not enough to establish aiding and abetting.

What the proof would have shown in this case is that Mr. Anderson's involvement began on June 8th of this year about 11:00 o'clock when co-defendant Kenneth Day, who was with co-defendants Gregory Floyd and Harry Burdick, telephoned Raymond Anderson and requested that he secure the assistance of Sanchez, and the use of Sanchez's car in a crime. Anderson agreed, after having been asked to do so by Day, and telephoned Sanchez and asked him to provide his car and his assistance in a crime. Sanchez agreed and then drove Anderson in his mother's car to meet with defendants Floyd, Burdick and Day who were waiting for them in the vicinity of Saki's Pizza on

Weybosset Street in Providence in an area called "The wall".

After the defendants thereby arranged to meet and gather in downtown Providence, they verbally agreed to rob a person, or persons, of money and property.

During the late evening of June 8th, and the early morning of June 9th, the defendants, that is, all of them, Floyd, Burdick, Sanchez, Day and Anderson, traveled the streets of Providence both in Sanchez's car and on foot searching for a person, or persons, to rob of money and property. In one such incident as they were walking together in the early morning hours of June 9th on South Main Street in Providence, they identified potential targets of a robbery in the vicinity of the Hemenway's restaurant on South Main Street. They selected these people because they were accessing an automated teller machine, and because they had just seen the victims get out of a car. They did actually initiate an attempt to rob those persons but a security guard appeared from out of the Hemenway's restaurant building and scared them away.

Shortly after that failed attempt at South Main Street, the defendants walked back across the

Providence River at Westminster Street, they retrieved Sanchez's car, and began again searching for potential robbery victims. While they were driving on Weybosset Street in the area of the Arcade shopping mall, the men identified Jason Burgeson and Amy Shute as potential targets of this robbery, in part because they were near their motor vehicle which Floyd wanted to steal. Floyd specified at that time, "I want that truck". Floyd and Burdick went after the victims in the truck while this defendant Sanchez and Day waited in Sanchez's car to provide Burdick and Floyd with a means of escape in case the robbery and carjacking attempt failed, and to continue to assist and participate in any ongoing criminal activity that was undertaken by Floyd and Burdick.

The evidence would show that while Anderson waited in Sanchez's car, that Floyd and Burdick abducted Jason Burgeson and Amy Shute at gunpoint and forced them into the Explorer, then drove off. As they drove past Sanchez's vehicle in the Explorer, Sanchez driving Day and Anderson as passengers, riding in Sanchez's car, began following the Explorer, the victims, Burdick and Floyd. They followed them again to continue to participate in this ongoing criminal activity and to assist.

They drove down Westminster Street to Empire and onto Broad Street. On Broad Street, Sanchez stopped the car that he was driving and Floyd stopped the car that he was driving, the Explorer, and they discussed their destination. Floyd suggested one location and then changed his mind telling Sanchez to take them to the place that they had previously discussed. At that point, Sanchez took the lead in his motor vehicle and Floyd followed in the Explorer to a secluded construction site off Hedley Avenue in Johnston in order to complete the robbery and carjacking of Jason Burgeson and Amy Shute without detection. At that construction site, the defendants Gregory Floyd and Raymond Anderson directed the victims to get out of the Explorer. Floyd, Sanchez, Day and Anderson all discussed some pro, some con, discussed in the presence of the victims whether or not to rape Amy Shute, thereby adding to the atmosphere of forced violence and intimidation. Anderson, at some point, at Floyd's direction, took jewelry from Amy Shute just prior to her murder. He allowed her to keep one gold and diamond style ring that she indicated was important to her. Then at that point, in the presence of this defendant, and the other defendants, Gregory Floyd

shot and killed Jason Burgeson and Amy Shute with a firearm by shooting them in the head. Anderson saw Floyd execute the victims, and he heard his co-conspirators Day and Sanchez encourage him to do so.

After Floyd had murdered Jason Burgeson and Amy Shute, all 5 men took off in Sanchez's car and took the Explorer and its contents, including money in the amount of $18 and change, more or less, they traveled together to a gas station and split the proceeds of the crime putting some of the money as gas into each of the vehicles.

In short, Anderson assisted in this crime by securing Sanchez and his car for use in the crime, by his continued presence and willingness to assist in the criminal activity, and by assisting Floyd to get the victims out of the car, and by taking the jewelry from Amy Shute.

The motor vehicle has passed and effected interstate commerce. The Explorer was manufactured in Louisville, Kentucky, and was first sold in Danvers, Massachusetts. I believe it was also insured in Massachusetts and has had an effect on interstate commerce.

MR. MANN: May I have just one moment,

please, your Honor?

THE COURT: Yes.

(PAUSE)

MR. MANN: Your Honor, if I could address the Court for a moment? I think that the record should be clear that Mr. Anderson testified before the Grand Jury under oath. In no way is he backing off from that testimony. I think, understandably enough, in the tension of this moment, there is some concern about the wording. I think, for example, that the 2 points that he particularly wanted me to make clear, which I don't think affect the factual basis at all what was just offered, are these, one is, with respect to the jewelry, Mr. Anderson has always taken the position, I believe, that he did that at the direction of Mr. Floyd. I don't think that affects this factual predicate for the plea one way or the other.

Mr. Sullivan referred to a discussion of rape. There was some discussion that's been reported. I think Mr. Anderson wants to make clear that at no point did he ever intend to, or express any intent, to commit any rape. Indeed, he did not want that to take place, Judge. I don't think any of those facts, though, affect the factual predicate for

this plea. And if I could have just another moment please, with Mr. Anderson?

THE COURT: Yes.

(Conferring with defendant)

MR. MANN: Can he talk from here, Judge?

THE COURT: Yes.

Q. Now did you hear all of that, Mr. Anderson, what the prosecutor said and what your attorney just said?

A. Yes, your Honor.

Q. And, as amended by your attorney, are those the facts in your case?

A. Yes, your Honor.

Q. Is there anything more you want to add or subtract from what the prosecutor just said?

A. No, your Honor.

Q. Now with all the things in mind that we've been discussing, do you now want to plead guilty to these two charges, the charge of conspiracy and the charge of carjacking resulting in death?

A. Yeah, your Honor.

THE COURT: All right. You may be seated. I'm satisfied with the responses given by the defendant during this hearing and make the following findings for the record: The defendant is fully competent and capable of entering an informed

plea. The defendant is aware of the nature of the charges and the consequences of the plea. The plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of each crime. The plea is therefore accepted, and the defendant is now adjudged guilty of these two offenses.

I will order a presentence report, and set the matter down for sentencing. I recognize that probably the sentencing date that I pick will be premature, but I will pick one anyway and get a presence report, and as the time approaches for sentencing either party can make a motion to continue it until the underlying matter is resolved and we can make a determination of whether the defendant has given the Government substantial cooperation. So, Mr. Jenkins, how much time does probation need to produce a presentence report?

MR. JENKINS: A date on or after March 26, 2001.

THE COURT: Did you say March 26th?

MR. JENKINS: I did, your Honor.

THE COURT: All right. Well, I'll tentatively schedule this for Tuesday, March 27th at 9:30 a.m., realizing that that may not be a very firm

date in view of the remainder of these proceedings will take some time. Is there anything else we should discuss?

MR. SULLIVAN: No, your Honor.

MR. MANN: No, your Honor.

THE COURT: All right. The defendant is being detained, and detention will continue. We'll take a recess.

(R E C E S S)

C E R T I F I C A T I O N

I hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Joseph A. Fontes

JOSEPH A. FONTES

July 19, 2001

Date

3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * *

UNITED STATES OF AMERICA C.R. NO. 2000-141 L

VS. PROVIDENCE, R.I.
13 NOVEMBER 2002

RAYMOND ANDERSON

* * * * * * * * * *

BEFORE SENIOR DISTRICT JUDGE RONALD R. LAGUEUX

APPEARANCES:

FOR THE GOVERNMENT: GERARD B. SULLIVAN, ESQ.
U. S. Attorney's Office
Fleet Center
50 Kennedy Plaza
8th floor
Providence, RI 02903
528-5477

FOR THE DEFENDANT: ROBERT MANN, ESQ.
501 Turks Head Pl.
Providence, RI 02903
351-5770

Court Reporter: JOSEPH A. FONTES
One Exchange Terrace
Providence, RI 02903
401-273-0344

Proceeding reported and produced by computer-aided stenography

NOVEMBER 13, 2002 - MORNING SESSION

THE COURT: Good morning, everyone. The matter before the Court is Criminal Case 2000-141 L, United States of America versus Raymond Anderson. The matter is here for sentencing. Will the attorneys identify themselves for the record, please?

MR. SULLIVAN: Your Honor, Gerard B. Sullivan for the United States.

MR. MANN: Robert Mann for Mr. Anderson.

THE COURT: The record will indicate the defendant is present at counsel table.

(Defendant present)

THE COURT: The presentence report indicates that the total offense level is 40 under the guidelines, that's after giving the defendant 3 points down for acceptance of responsibility, and his criminal history category is 3. That produces a guideline range of 360 months to life imprisonment.

The defendant has filed a motion for downward departure and objected to various parts of the presentence report, and the Government has filed a motion for downward departure based on substantial cooperation. So the Court will have to resolve those matters before determining what sentence shall be imposed. So I'll hear from defendant's counsel first

as to his objections to the presentence report and his motion for downward departure.

MR. MANN: Your Honor, there are few evidentiary matters. First, I'd ask that these documents, these two documents be marked as Exhibits A and B. These are by agreement, the complete records of the two district -- state district court adjudications that were the basis for the criminal history points, the PSR, Judge. We'd had the records here earlier this morning and Mr. Sullivan and I reviewed these records and we're in agreement they're complete records for purposes of the sentencing hearing.

THE COURT: All right, they may be marked Defendant's Exhibits A and B for purposes of this sentencing hearing.

MR. MANN: Your Honor, the next thing I would offer is this, we have in the courtroom the custodian of records of the Sixth District Court, Court Reporter's office. We would -- I think we're in agreement that she would testify that there is no court recording of the August 11th proceeding because a shortage of personnel required that proceeding to take place in a courtroom in the back of the normal courthouse where they simply didn't have any recording devices, and that explains the absence of a transcript

for that date.

MR. SULLIVAN: So agreed without the necessity of testimony, your Honor.

THE COURT: All right.

MR. MANN: I would next offer as defense exhibits transcripts of the hearings on November 19th and November 22nd in the State District Court proceedings and the tape-recording from which those transcripts were taken, Judge. Copies were provided to the Court and the prosecution earlier.

THE COURT: All right. How do you want to mark those?

MR. MANN: I would suggest Exhibits C, D and E, Judge.

THE COURT: All right, they will be so marked.

MR. MANN: Finally, Judge, for the purposes of the record today being complete, I've asked that the transcripts of Mr. Anderson's testimony in the Kenneth Day trial be marked as exhibits in this case and I provided copies earlier.

THE COURT: What letters do you want there, F and G?

MR. MANN: F and G please, Judge.

THE COURT: All right, they'll be marked as

Exhibits F and G.

MR. MANN: Your Honor, next the defense would call Anthony Capraro from the Public Defender's Office on the issue of -- this addresses the issue of whether or not Mr. Anderson was represented by the public defender in the State District Court proceedings. I think his testimony would be very brief.

THE COURT: I wasn't planning on taking any testimony today.

MR. MANN: I'd make an offer of proof that Mr. Capraro would testify that he's here as the custodian of records of the Office of the Public Defender, and that he would testify that the public defender's office has no record whatsoever representing Mr. Anderson on any misdemeanors that are the basis for the criminal history points in this case, that in fact their only contact with Mr. Anderson was to decline to represent him when he was presented in the state court on the charges that were the basis of this case on the basis of conflict. The reason that is potentially significant is that in one of the District Court adjudications, the one I think for August 11th, the box referred to "attorney" is checkmarked public defender, and he would say that they had no contact with him, did

not represent him, Judge, in any proceeding with respect to either the August 11th or November 19th matters. That's the offer of proof I would make with respect to his testimony. I'm prepared to call him.

THE COURT: How would he have any personal knowledge of that?

MR. MANN: Well, he would testify as the custodian of the records of the Public Defender's Office and they'd done a search of the Public Defender's records, and that's how they would know that, Judge.

THE COURT: All right. We can accept your offer of proof that there are no records at the Public Defender's Office representing him at that time.

MR. MANN: Finally, Judge, with respect only to the issue of whether or not Mr. Anderson knowingly waived counsel with respect to those District Court misdemeanors, I call Mr. Anderson very briefly on that issue, or I'd make an offer --

THE COURT: I hadn't planned on taking any testimony today. I hadn't set aside the time to do that. I have other things to do. I have other trials. And had I known that, I would have set aside the time to take testimony.

MR. MANN: Well, I apologize. I think his

testimony would be very brief. I'll make an offer of proof. What he would say is that with respect to the adjudications on August 11th and November 19th, he did sign the waivers that are in the form -- that are in the file. He would acknowledge that's his signature on those two waiver forms. He would say that he understood that he was pleading no contest, that he did not understand that he was waiving his right to a lawyer, and in support of that, I have already had marked the transcript of the November 19th hearing which I think supports that position very strongly. There is no transcript of the August 11th hearing based on the stipulation we made. That's the only purpose of putting him on, and I'd make that an offer of proof as to what his testimony would be.

THE COURT: All right, I'll accept that as an offer of proof.

MR. MANN: Thank you, Judge. That's the evidence I had to present. You want me to begin to argue then as to the ---

THE COURT: Yes, I want to hear your argument as to your objections and your motion for downward departure.

MR. MANN: Judge, I will try not to repeat everything I said in the presentence report but I want

to highlight certain points. I assume that the record already includes both my objection to the PSR and the -- the motion for downward departure and the sentencing memorandum that was part of that.

THE COURT: Yes, it does.

MR. MANN: The first point I'd made, Judge, was an objection to using the base offense level of 43. Without repeating everything that I've said in the memorandum, Judge, the point I want to emphasize is that the defendant's state of mind in this case is that required of an aider and abettor, Judge, and that state of mind did not require an intent to kill. That doesn't in any way absolve him of responsibility for what happened. He's never suggested that. But even when he pleaded guilty, it was clear in the colloquy that he said that he had no intent to kill, Judge. I think that that is significant because notwithstanding the Government's memorandum in this case, the relevant state of mind in this case for this adjudication does not necessarily require malice aforethought, does not necessarily require an intent to kill, and in fact this defendant did not possess that intent to kill, Judge, and whatever horrific happened that night was, it wasn't his intent to kill, Judge. That's the state of mind that brings it up to a level 43, Judge. That's

the -- the absence of that specific state of mind with intent to kill, Judge, is what I submit is the basis for reducing the base offense level, Judge, from 43 to a lower offense level. I had suggested, Judge, that it would go down as far as the second degree murder offense level or perhaps something in between, Judge. I've laid out that argument in both my sentencing memorandum and my objection to the PSR, and that's the heart of my argument. I've also tried to respond briefly to the Government's sentencing memorandum which it filed in that regard.

I also have specific objections, Judge, to the criminal history category that was calculated, Judge. Paragraph 27 assigns 1 point for the charge of obstructing a police officer. In the PSR, it refers to Mr. Anderson being represented by the Public Defender. I think it's clear that he was not represented by the Public Defender. I think an examination of those files indicates no entry of appearance by the Public Defender. Docket entries don't indicate any representation by the Public Defender. All that there is in that file of any sort, Judge, is the waiver form, and I've made the offer of proof as to what Mr. Anderson would say took place. Now I think particularly instructive there is if we jump ahead to

November 19th. On November 19th, Judge, again the PSR refers to representation by the Public Defender but there is no entry of appearance and there's nothing in the docket to indicate that the Public Defender represented Mr. Anderson.

I think when you look at the transcript of the state court proceedings on November 19th, Judge, where the waiver form is handed to Mr. Anderson, there is a lack of colloquy with respect to Mr. Anderson to determine whether or not he understood he was waiving his right to counsel. He's basically handed the form, told to sign it. There's not even an indication, as my recollection of the transcript reveals, of him even handing the form back, though it's certainly in the file. There's no one -- there's no going over the file with the -- the questions with the defendant, there's no going over whether or not he understands he has a right to a lawyer, there's no going over what he understands what he's giving up, Judge. Under those circumstances, I submit that there was no meaningful waiver of counsel, Judge, on either the first date, August 11th, I think it is, or the second date November 19th, Judge.

Based on that, Judge, I would argue that neither paragraph 27 nor paragraph 28 ought to be

counted in terms of criminal history points. The corollary, that is, that the 2 points added in paragraph 30 of the PSR, placing the defendant on probation, also should not count, Judge, because if he was unrepresented, or there wasn't -- and there wasn't a meaningful waiver, a knowledgeable waiver of his rights, then the probation that he was on then was the basis for the 2 points in paragraph 30 also should not count, Judge.

I think that the impact of Alabama vs. Shelton, 122 Supreme Court 1764, Judge, provides strong support for this position that when you have a situation like this where a person pleads, even though they don't get a jail sentence, Judge, that adjudication cannot be the basis for subsequently enhancing the sentence, I would argue under Shelton, Judge, unless either the person has counsel or there was a meaningful waiver, and I submit in this case there was no meaningful waiver.

In addition, Judge, I challenged, and I submit that the records support this claim under paragraph 27, there's no indication that the defendant was actually on probation, that the filing itself was converted from the filing to probation.

For all of those reasons, Judge, I submit

that the criminal history category should be reduced to criminal history category 1 rather than 3. Even if the Court rejects, Judge, all of those arguments, Judge, and I submit that they're valid arguments, I think if you look at these misdemeanor adjudications to say that these minor misdemeanor adjudications justify elevation of this defendant to a criminal history category 3, is an overstatement of his criminal history category, Judge, the Court should make an adjustment accordingly.

I had asked the Court to make an adjustment of the offense in this case under guideline 3(b)1.2. That argument was set forth both in the objection to the PSR and in the sentencing memorandum, Judge. It's always difficult to say if somebody should get a deduction of points when you have a horrible crime, but it is within the context of what kind of crime it is, what Mr. Anderson's role in this event was, and I submit, Judge, it really was a minor role. I'm not saying minimal, I'm not saying he didn't play a role, Judge, but by every account, Judge, what his role was was that of an aider and abettor, Judge. That's what he's always acknowledged, that's the plea that the Court accepted, Judge, and even the Government's version, Judge, at sentencing, I think, synopsized his role as that of being principally as an aider and

abettor. He took some acts that night, but I think in the context of the ultimate crime for which he's being punished here, the deaths, Judge, with respect to that, his role is minor.

Those are, Judge, the specific objections to the PSR.

Now, I've moved for a downward departure, and the Government has moved for a downward departure. Do you have Dr. Stewart's letter which I assume is part of the file, Judge?

THE COURT: Yes, it is.

MR. MANN: But I think, Judge, beyond Dr. Stewart's letter, and beyond this defendant's family history, there are -- there are certain salient facts that really make this case very different than the case of the other defendants, and I think the arguments come -- meld together. I don't think it so much matters making a separate argument in support of my motion for a downward departure and saying that's separate from the response to the Government's motion for a downward departure. I don't think you can totally isolate everything, Judge.

What happened in this case was this defendant from day 1 confessed, and after he confessed, Judge, he started cooperating with the Government, and

he was the first person, Judge, to plead guilty. He testified before the Grand Jury. He came in the court and he testified against Mr. Day. Judge, that is more than just words. That is real action for which Mr. Anderson will pay a price for every day that he's incarcerated, Judge. It goes without saying that he will be identified in the penal system for the rest of his life, everyday he's in that system, Judge, as somebody who cooperated with the Government against co-defendants in a homicide prosecution, Judge, or a homicide-like prosecution, not carjacking.

The consequences of that are truly, I submit, Draconian for him, and I think they reflect, Judge, his real remorse and real commitment, Judge, and a real appreciation by him of the fact that what he did was terribly wrong but he's trying to right his ways. And I think it is consistent with all the evidence in this case about what type of person this is, a follower, Judge, not a leader. A person who should have taken action that night to stop what took place, didn't, but also didn't initiate the action, wasn't the person who caused these killings, Judge.

The question is, I think, how much of a downward departure ought to be granted, and I do take exception to the Government saying only a one level

departure, Judge. There's no formula that you can look at when you say how much of a downward departure, Judge, but the closest thing I could think of when I was trying to formulate this was when you think antidotally about organized crime cases, when people from organized crime come in and testify against other organized crime members and are given a significant reduction in sentence for that, even when they themselves will face serious charges. I think this certainly isn't an organized crime case but I think the analogy to some extent may work. The consequences to Mr. Anderson of his testifying for the Government, Judge, will be there everyday he's in prison, Judge. I think beyond all that, Judge, maybe the most significant thing about Mr. Anderson is that I think that he is a genuinely remorseful person, Judge. I think that he is a person who tragically was where he should not have been and tragically didn't have the independence to assert himself on the night in question, but he is not, Judge, an evil man. He is not a person who wanted to ever kill. He is a person who from day 1 has been remorseful, Judge. I think all of those factors, without repeating everything I've said in the sentencing memorandum, and memorandum in support of the downward departure, Judge, and all the letters

that were submitted, I think support a request for a significant downward departure, Judge. Understand we're still talking about a long term of years in jail.

May I have just a moment, Judge?

THE COURT: Yes.

MR. MANN: Judge, there is one other thing that I meant to say. I think one other reason why there should be a significant downward departure in this case stands independent of Mr. Anderson but it still merits consideration, which is that I think that on the one hand he's certainly to be given credit for having come in to testify against a co-defendant in this kind of case, but I think also, as a society, a message that ought to be communicated is not that you get away with everything by coming in and testifying, but that there is some recognition for testifying for the Government against co-defendants in a case like this where the record is clear he knew the co-defendant, he knew the people involved, and you take that risk, Judge, and I think that is another important side or reason for granting a downward departure.

THE COURT: How far down do you believe the Court should depart? It's obvious the Government is asking for a downward departure, also. It's a question of how much.

MR. MANN: I think that is the question, Judge. The question is how much of a downward departure, Judge. I've thought of it a lot, Judge. I'm not going to ask you to give him a slap on the wrist, but I also think, Judge, that -- could I speak to my client for one second, Judge?

THE COURT: Yes.

(Conferring with client)

MR. MANN: 20 years.

THE COURT: You recommend 20 years of incarceration?

MR. MANN: Right. I mean I'm not prepared to stand up here and make a silly recommendation.

THE COURT: All right.

MR. MANN: Thank you.

THE COURT: I just wanted to know what your views were on the subject.

MR. MANN: 20 years, and that is a painfully long sentence in the federal system. That is not getting out in 7 or 8 years, Judge.

THE COURT: I understand.

MR. MANN: Thank you.

THE COURT: Mr. Sullivan.

MR. SULLIVAN: Your Honor, with the Court's indulgence, I will respond to the defendant's

objections, then his motion to depart, the Government's motions to depart, and the victims families, Mrs. Burgeson and Mrs. Shute would also like to address the Court at that time.

First the defendant's objections to his criminal history category. Initially, it's the defendant's burden to show the Court that he had, in fact, an unconcealed plea.

THE COURT: Will you bring that microphone closer to you and speak up?

MR. SULLIVAN: Yes. It is the defendant's burden to show the Court that his plea was, in fact, uncounseled or that he did not voluntarily waive the right to counsel. As a threshold matter, the Government's position is that he has failed in that burden. The records that are before your Honor now as Defendant's A and B contain forms filled out by the District Court Judge in which the boxes are checked off "referred to Public Defender" or "waived" respectfully, but more importantly the last document in each of those exhibits is a waiver form signed by Raymond Anderson which his lawyer knowledges he, in fact, signed. Not much more can be asked of the Rhode Island District Courts than to engage in at least that level of inquiry.

Furthermore, the transcripts that are also marked as defendant's exhibits show that the Judges addressed this issue. On November 19th of 1999, the Judge addresses Mr. Anderson and says: Okay, I want you to read a waiver. If you don't have any questions, I want you to sign it, okay? That's the waiver that's in the file. That's the waiver that contains Mr. Anderson's signature.

On November 22nd -- I'm sorry, on that day, the Court then further inquired: Mr. Anderson, did you read that waiver? And Mr. Anderson said yes.

On November 22nd, again the Court provided Mr. Anderson with a waiver which is in the file which is signed by Mr. Anderson and is acknowledged by his attorney, and the Judge asked him again: Did you read that waiver, Mr. Anderson? Mr. Anderson answered yes. So I suggest that he has failed in that burden. The lack of a record by the Public Defender is inclusive on this point. The case relied on by Mr. Mann, Shelton, is distinguishable. In Shelton, the U.S. Supreme Court looked at what they called the controlling rule, and that controlling rule is that absent a knowing and intelligent waiver, no person may be imprisoned for any offense unless he was represented by counsel at trial. Shelton was a different case than this. Shelton was a

defendant who was to be imprisoned as a violator based on an uncounseled suspended sentence. The Court found that imprisonment in that case was for the underlying offense, the one that was uncounseled, and not for the violation and, therefore, in Shelton, the Supreme Court found that it violated the controlling rule. Shelton is distinguishable because Anderson waived, which is expressly provided for in Shelton. Anderson was never imprisoned on the underlying conviction. Anderson is not being imprisoned on the underlying conviction now. Shelton allowed uncounseled pleas to be used in subsequent proceedings to enhance sentences because the defendant is being imprisoned on the new offense not on the old uncounseled offense. In fact, Shelton provides, once guilt has been established, as we noted in Nichols, another case cited in Shelton, sentencing courts may take into account not only a defendant's prior convictions but also his past criminal behavior, even if no conviction resulted from that behavior. So Shelton is of no avail to the defendant. The First Circuit has a case United States versus Gray, which is cited in the Government's memorandum which is more on point and is controlling but is not overruled by Shelton, but most importantly the guidelines have a provision for this. And again I checked the most

recent revisions in November of this year and they don't seem to have changed. They haven't been changed in the wake of Shelton, Shelton which was decided in January, and there the guidelines provide in a background note that prior sentences not otherwise excluded are to be counted in the criminal history score including uncounseled misdemeanor sentences where imprisonment was not imposed.

So on all scores, these are countable convictions. On all scores the points accumulate, and Mr. Mann then takes it one step further and says, well, if the convictions don't count, then you can't count the fact that he was on probation and give two additional points for an offense committed while on probation. Again on that score, his claim is defeated by the records in the case and by the case law and by the guidelines, and whether the defendant was on filing for a year or probation for a year he was still under a criminal justice sentence at the time that he committed this offense.

Finally on this issue, even if the defendant were right on all of this, and for some reason the convictions were legally deficient, that would only lead us to the guideline provision that says his criminal history might be underrepresented. At that

point the argument becomes rather circular.

Q. Defendant also looks for a minor role adjustment under Section 3(b)1.2. That section is not wholly subject as the defendant suggests. Anderson's role in this case was important to the completion of the crime. He recruited Sanchez. He secured a car. He helped hunt for victims. He acted as a lookout. He was ready, willing and able to assist in this crime and other crimes that night in any way that he could. He was present at the scene. In fact, at one point, I believe the testimony was he was riding fireman style on the back of the Explorer, so dogged was his intent to remain part of this criminal activity. He supported this crime by his presence. He helped remove the victims from the car. He helped calm them. He did not speak out against this crime, although he did not encourage it, either, and he took jewelry from Amy Shute just prior to her execution. Just because he did not fire the fatal shot doesn't make his role minor in any sense. The bottom line is Mr. Anderson was in it up to his eyeballs and so the Government suggests that a minor role adjustment is not appropriate.

The defendant also makes a departure request for state of mind and unintentional death under the sentencing guideline, Section 2(a)1.1. That guideline,

your Honor, is simply not applicable here. It is for a very different kind of crime, a very different kind of criminal act. That guideline provision is aimed at a mental state that is either reckless or negligent, and the example used in the guidelines is that of a bank robber who passes a note to a teller and the teller has a heart attack and dies. Dr. Stewart's letter wholly fails to address this issue on that level, wholly fails to establish that the defendant's state of mind was either reckless or negligent. It was more than that. And furthermore, that state of mind is only one of three factors that the Court is to consider when looking at this particular departure request. The other two factors are the degree of risk involved, and here this was an armed carjacking with a very high risk of harm to others. The third factor is the underlying conduct, and here the predatory criminal conduct of Mr. Anderson is again disturbingly dangerous, and does not qualify him for this departure. Even if it did, I would recommend to the Court that you exercise your discretion and decline to depart.

Finally, the United States' request for departures and, again, even if the defendant were eligible for his departure request, or he was somehow correct in his assertion that his criminal history

category was incorrect, or was overrepresented, the Court has at its disposal the 5 factors, departure factors, that the Government has urged in all of these cases, death, abduction, weapons, extreme conduct and criminal purpose, to rectify any of those deficiencies.

Finally, and most significantly and most importantly in this case, is the Government's own motion for a downward departure for substantial assistance, and that is the motion that gives the Court the widest degree of discretion here today to depart from the guidelines in any way your Honor sees fit.

This part of the case, this overall case, this carjacking case, this sentencing proceeding, is perhaps the most disturbing and disagreeable and distasteful of my duties in this case, and I say that not to undermine my recommendation but to underscore its importance and the importance of the duty that I fulfill here, the duty to the criminal justice system and my duty to this defendant under the terms of the plea agreement. This is an absolute necessity. Substantial assistance departures are necessary to secure the cooperation of defendants when we need it, not only in this case but in all cases. No matter how objectionable it might be in any one case for any one defendant, it is a necessary function of the system and

it's my duty to recommend a departure here for the system and also for this individual defendant who has earned this departure request.

My analysis begins with the presupposition that this defendant deserves a sentence of life imprisonment, just like his co-defendants. When you look at the Floyd sentencing, we examine the senseless loss, the utter brutality, the despicable coldness of heart involved in this crime. In our mind's eye we see a murder scene chiseled there, seared there, by pictures and testimony, in many ways sadder than any other than in recent memory. Two young otherwise vibrant college kids still embracing even in death and covered with blood and gore. It is a scene that has caused an experienced Providence homicide detective who was present that June afternoon, but who was not otherwise involved in this case, to seek me out just to tell me how wrong this one was. He saw the kids, he saw the blood, he saw the gore, he saw the flies, and he sought me out just to tell me how wrong this was. It should not be. It was the worst of many.

I have been involved in too many murder cases, your Honor, also. This was the worst of many. We look at Burdick's sentencing and we examine the group dynamics of what happened that night, that this

was a group motivated crime. What this defendant called wilding. Each man doing more as a group, each man going further as a group than any individual would have. That night they acted as a pack. That night they acted as predatory animals.

Finally, we look at the Sanchez sentencing and there we examine the psyche of a man who urged Floyd to pull the trigger, a man who had a troubled childhood just like this defendant and various psychiatric maladies but who was nevertheless responsible for his conduct just like this defendant.

Now we have the Anderson sentencing, and all the same reasons apply for giving him a life sentence. He recruited his accomplices, he secured the wheels for the gang, he hunted with the pack, his presence embolding the others, he physically assisted Floyd. Now while he did not encourage the murders, he also did not discourage them. He did not leave despite the opportunity to do so, and he stuck with this murderous group, at least until his own self-interest led him to cooperate. Only Floyd pulled the trigger in this case, but Anderson's presence and support is the moral equivalent of pulling the trigger. So he is equally responsible for the murder that no one can erase from memory. Floyd, Burdick and Sanchez all got life, now

except for his assistance to the United States, Anderson would be getting a recommendation of life, also. But the guidelines provide for a departure in Mr. Anderson's case under Section 5(k)1.1 of the guidelines.

There is a 5 factor analysis which I have provided the Court with, an in-depth analysis in the memorandum which I will not repeat here.

The defendant questions my opinion as to the value of his job, but with all due respect, that is really irrelevant. The first factor that the Court encounters is the Court's evaluation of the significance and wrongfulness -- usefulness of the defendant's assistance, taking into consideration the Government's evaluation of the assistance rendered. It doesn't say the defendant's evaluation of that distance, probably because those rose-colored glasses would do little to clarify the issue at hand.

In this case, by the time Anderson testified, Floyd had already surprisingly decided to cooperate and became the principal witness in this trial. Anderson was called only to corroborate Floyd because he was the triggerman. And quite frankly, in my opinion, Anderson did a poor job of it. Never in my 18 or 19 years of trying cases has a witness pulled a

year ordeal, I have seen and learned a lot about the judicial system. I have learned even though you plead guilty to a crime, you earn points. I've learned phrases such as guideline sentencing, upwards and downwards departure, degree of culpability. I know when this nightmare started that 5 men stalked, terrorized, tormented and killed Amy and Jason. Not one of them tried to prevent it. I knew it then and I know it today. I ask you to sentence Raymond Anderson to the maximum sentence under the guidelines. I know you will give him what you feel is just. I would like to say whatever sentence is you have handed out and the one you are about to is better than the alternative that was left to myself and my family, as well as the Burgesons. He is still alive. He can still see his family. Because of his actions, we no longer have that luxury. Thank you.

MR. SULLIVAN: Mrs. Burgeson will next address the Court.

MRS. BURGESON: What I have to say has to do with the devastating pain that our family is trying to deal with. From the time that our daughter Kelly was old enough to speak and knew what a brother was, she wanted one. That is all my husband and I would hear, that she wanted a brother. There was 6 years between

Kelly and Jason, and when Jason came along she was so happy. When Kelly had to go off to school, I started getting telephone calls from the school nurse telling me that Kelly wasn't feeling well. I would have to go to the school and bring her home. This happened several times and she apparently wasn't sick. The school nurse told me that maybe Kelly was having feelings of jealousy that mom was home with the new brother. Well, I don't think it was jealousy, I think she just wanted to be with her baby brother. I didn't see signs of jealousy. I just saw her wanting to be with him and loving him. Kelly was like a little mother to him, and she loved him very very much. She always looked out for her little brother, and if anyone gave him a hard time she was always there to protect him. She has had to deal with the guilt that she wasn't there when he really needed her. She wasn't there to protect him. I know that she should not feel any guilt but we can't help what we feel. Last week it was my husband's birthday. We had a cake, and we lit a candle for Jason just to try to feel that his presence was there with us, and after we had the cake, Kelly and I were clearing the table, and I looked at her and she stood there with a clean dish in her hand. She went to the cupboard and put it back, and then looked at me and

said "Jason cleaned his plate". She had set a dish for Jason and I hadn't even realized it. My heart just ached for the loss of my son and for the pain that my -- for the pain that my daughter has within her. It has been two and a half years, and the pain is just as bad, if not worse, because reality is setting in. Jason will not be coming home. Kelly and I have been to counseling, which I can't say has amounted to a whole lot. This pain we have got to learn to live with. We just haven't figured out yet how to do it. I know that Mr. Sullivan has to recommend a downward departure for Raymond Anderson's testimony. Raymond Anderson's testimony wasn't a testimony to help the prosecution, it was a testimony to help Raymond Anderson. He downplayed his whole role in this case, and he described his role as simply chilling. Well I hope Raymond Anderson chose a hell of a long time behind bars. He didn't testify out of the goodness of his heart. If he had a heart, he would have tried to help Jason and Amy. Their tragic murder bothered him so much that he had to go to a party afterwards. He deserves the same consideration that he gave Jason and Amy, which was none. After Amy's parents and my husband are gone, and I are gone, it will be up to our daughters to go to appeal hearings. When this

sentencing is over, it isn't really over. This is something they will have to deal with the rest of their lives. Your Honor, my family and the Shutes got a life sentence. Jason and Amy got a death sentence. If you have people that are innocent, and they get a life sentence and a death sentence, then I don't think someone that is guilty of a crime should get less than what the innocent people have gotten. I am asking that you would reject Mr. Sullivan's recommendation and impose the maximum sentence that you are allowed within the guidelines. And you know, Raymond Anderson, it amazes me how much you did to save your own ass and did absolutely nothing to help two people that were about to lose their lives. Thank you, your Honor.

THE COURT: Thank you. Mr. Anderson, do you have anything to say before the Court makes the guideline calculations and sentences you?

VOICE: Excuse me, your Honor, I have something to say.

THE COURT: I'm sorry, who are you, sir?

VOICE: I'm his uncle.

THE COURT: I can't hear you.

VOICE: I'm his uncle.

THE COURT: Well you'll have to sit there.

VOICE: I'd like to be heard, your Honor.

THE COURT: You're not entitled to be heard.

VOICE: Thank you, your Honor.

THE COURT: I've given the defendant an opportunity to be heard. That's the only one who's entitled to be heard at this point. Pull that microphone right up to you and speak into it.

THE DEFENDANT: Your Honor, I know we're here today for a tragedy which I'm not proud of, an act that one cannot change but only try to understand, and with that I say a decision we make in two seconds can determine which way your life can go. May that be at a workplace or the comfort of your home. But, unfortunately, the decision I have made might cost me the rest of my life in jail. A punishment some in this courtroom pray for. But let truth be told, there are no winners here today, only losers. What I was a part of had no bearing on the type of person I am. I am not a monster. That night is a night I will never forget because the emotions I felt were intense. I felt confused while being afraid, and afraid while becoming blank, all in a matter of seconds which left me shocked and now scarred for the rest of my life with the replay of a nightmare.

Your Honor, numerous letters I've read from the victims' family, but today one recently stood out,

and this one comes from Nicholas Soltys. It says, and I quote, "Everything we do has been affected. All we ask is that you create the same lifelong affect on the guilty parties, a lifelong sentence of pain, heartache and emptiness." And, your Honor, I'm here to say to you everything I feel is in those three words, but not because of these four walls that surround me, but because I wasn't strong enough to prevent this from occurring. I would give anything to give life back to those who are so desparately missed, even my own, but I cannot. Nothing anyone does can change the situation, and I only beg that you see that, see that I'm not a perfect person but a person who has made mistakes and who is capable of growing from them. Your Honor, I know today, I plead today, to this courtroom, for a second chance. I beg you to judge me for me and the minor role I played, and not see me as I'm made out to be, heartless.

And to the families of Amy Shute and Jason Burgeson, I know these words will never white out the pain you felt from that night and every night in this matter. My only hope is that in some way or form you find comfort now with the words I've spoken and the last one I forever leave you with, "I'm sorry". That's it.

THE COURT: All right. Thank you. My first task is to deal with the objections of the defendant to the presentence report. I think those are largely academic because I have the power to depart downward in this case and the prosecution has asked me to depart downward. So I have great discretion in what sentence I can impose here today.

Sentencing is probably the most difficult task that any trial judge can perform. I've been doing it for 34 and a half years. It never gets easier. I've sentenced in some pretty horrendous cases. But as I've said before, this was the worst.

There are two factors that distinguish this defendant from the other four murderers in this case. Number 1, he's the least culpable. He didn't have an intent to kill, although he's responsible for that killing because he was an aider and abettor, and if he were tried for murder in the state courts, he would be looking at a life sentence for first degree murder. He cooperated with the Government, and he testified publicly. I'll get to that matter in a few moments.

The defendant argues that he shouldn't have a total offense level of 43 because he had no intent to kill. But as I've just indicated, he is charged with that intent because he is an aider and abettor, and

whether it's considered a second degree murder or a first degree murder, if it was tried in the state courts the fact of the matter is that he was an accessory before the fact of murder in this case. So the total offense level of 43 is correct. And he has been given the benefit of 3 points downward for his acceptance of responsibility. His criminal history category is 3. He is awarded 1 point for each of his misdemeanor convictions and 2 points are added because he committed this crime while under probation from those previous convictions, and that produces a criminal history category of 3. That is a correct calculation.

He pleaded nolo to the misdemeanor of obstructing a police officer and a misdemeanor of disorderly conduct and possession of marijuana. He waived counsel. There's a written waiver in the record that he signed. There's been no evidence to convince me that he didn't understand what he was doing. He got a break in the District Court in Rhode Island. He got a filing on one. He got 6 months unsupervised probation on the other. Under the guidelines, those are convictions that are to be counted. So the calculation is correct. If anything, his criminal history underrepresents his previous criminal conduct.

He has a serious robbery charge pending that's obviously never been brought to trial because of this case. And that night, he and his cohorts were involved in attempting to rob innocent citizens in downtown Providence. That indicates that his criminal history doesn't properly reflect what his previous criminal conduct has been. So there's no basis for reducing his criminal history category.

There's a claim that his role in this offense was minor. It was less culpable than the other four, but it wasn't minor. He was part and parcel of that group of marauders who were out to rob people that night. He was part and parcel of the robbery that took place at the scene of the crime. So he was an aider and abettor in every sense of the word.

He was the least culpable because he didn't participate in the actual shooting, and he didn't urge or demand that these innocent young people be killed. That's the only thing that distinguishes him from the others. But he didn't speak up either. He didn't stand up and say no, I won't be part of this murder. We should let these young people go to live their lives. He stood by and saw this brutal senseless killing take place. So his role was not minor.

There's nothing that's been said by defense

counsel that justifies a downward departure other than the Government's motion for downward departure because of substantial cooperation, and it seems to me that defense counsel is really relying on that for his request that there be a downward departure.

There's no question that the defendant cooperated immediately. He was the only one who really admitted to what happened early on. The others were all trying to blame each other. He made statements. He was debriefed by agents of the Government. He testified before the Grand Jury which was a substantial factor in the return of the indictment. And he testified at the trial of Kenneth Day. His main contribution to that trial was that he corroborated the testimony of Floyd. He corroborated that Day counseled the killing at the scene. He corroborated that Sanchez stated that if Floyd didn't do the killing, he would take the gun and do the killing himself. He corroborated the role of Floyd and Burdick in the carjacking.

It is difficult to determine how far down a court should depart for substantial cooperation. It's necessary for law enforcement to have people who are connected with crimes to come forward and make a clean breast of things and then cooperate and literally put

their lives on the line by testifying, and having to live with that in prison for many many years. There's always a danger that there will be retaliation. I'm satisfied he told the truth during the trial. I relied on his testimony in sentencing Sanchez. So he is entitled to some consideration here today.

I don't like to play the numbers game, one point here and one point there, but sometimes that's a way of arriving at what a just sentence should be. The Government recommends that I go down one point to a level 39. That would produce a guideline range of 324 months to 405 months of incarceration. I choose to go down two points, one because of his substantial cooperation and one because he is the least culpable. That produces a total offense level of 38, a criminal history category of 3, and the guideline range is 292 to 365 months of incarceration. I choose the sentence to be imposed at 360 months, 30 years of incarceration. I think that sentence fits his crime.

So on Count II, I impose the sentence of 360 months of incarceration.

On Count I, the maximum is 60 months, and I impose that sentence to be served concurrently. When he comes out of prison, he'll be on supervised release.

On Count II, 5 years of supervised release.

On Count I, 3 years is the maximum I can impose, to be served concurrently. I will not impose any fine. I have to impose a special assessment of $200. $100 on each count.

Frankly, I don't know whether the defendant has a right to appeal this sentence. I have overruled his objections and denied his motion for downward departure, so maybe he has a right to appeal. But I have granted a downward departure in accordance with the Government's motion, and so I don't know whether he has a right to appeal. But I notify him of the fact that if he does have a right to appeal, and he chooses, and he can't afford to appeal, he can apply to the Court to appeal in forma pauperis. Are there any questions?

MR. SULLIVAN: No, your Honor.

MR. MANN: No, your Honor.

THE COURT: All right. The Clerk will draft the Judgment of Conviction. We'll take a recess.

THE CLERK: All rise.

(R E C E S S)

(9)

**Mann & Mitchell**

**Attorneys at Law**

401-351-5770
Fax 401-521-4305

Robert B. Mann
Suzanna J. Mitchell
Dana Harrell

OCT - 7 2002
U.S. ATTORNEY
DISTRICT OF RI

October 7, 2002

United States District Court
Office of the Clerk
One Exchange Terrace
Providence, RI 02903

RE: **UNITED STATES VS. RAYMOND ANDERSON - C.A. No. 00-141L**

Dear Clerk of Court,

Enclosed please find the report from Ronald Stewart, MD regarding the above entitled matter.

Very truly yours,

Robert B. Mann

Enclosure

cc: Gerard Sullivan, Esq.

One Turks Head Building
Suite 501
Providence, Rhode Island 02903

E-mail:rmann@conversent.net
URL: www.lawyers.com/mannlaw

HUMAN SERVICES CONSULTANTS, LTD.
277 WATERMAN STREET
PROVIDENCE, R.I. 02906

RONALD MARK STEWART, M.D.
MEDICAL DIRECTOR

(401) 331-7778
331-7777

October 7, 2002

Mr. Robert B. Mann
One Turks Head Place
Suite 501
Providence, R.I. 02903

Re: Raymond Anderson

Dear Mr. Mann:

I interviewed Raymond Anderson, DOB 2-19-81, at the Wyatt Correctional Facility on the 26th of September, 2002, subsequent to reviewing the presentence investigation. The purpose of the interview was to perform a psychiatric evaluation for presentation at sentencing. Raymond is a 21 year old Black male who is illegitimate, his biological father abandoned the mother. His mother subsequently abandoned her children. However, through the good graces of one of her many boyfriends, Raymond and two of his brothers were adopted by the mother of said boyfriend, one Maxine Anderson. The mother was addicted to a number of substances and failed to provide an acceptable home for her children.

Maxine Anderson, in her extreme charity, adopted and cared for, not only Raymond, but his two brothers and her daughter, Tanya. I interviewed both Maxine and Tanya Anderson over the phone. Tanya related, "Ray had a hard time in school making decisions and staying with them, unable to follow through. He's always made poor choices. A lot has to do with before my mother got him, his mother left five children and always promised she would come back to them and that's always troubled him." I next interviewed Maxine Anderson, the adoptive mother. Maxine relates that " When he found out that my son was the father of the other two brothers I had adopted, but not him, he became very upset." She told me that he found this out from a school counselor that he had been sent to in order to help him cope with his ongoing behavior and substance abuse problems. Maxine Anderson further related that occasionally, after school, as a very young child, he would wander around outside futilely searching for his mother.

The child lived through the chronic anguish that emanated from never knowing when his mother would appear. This random nature of his mother's visits further contributed to his feeling of insecurity.

Raymond related that he became "really depressed at age 12 or 13." He said he had gone to LaSalle but "I had to leave because I was having trouble being in a bad mood and doing drugs to feel better and get rid of all the pain I had in me about my mother. I got tired of life and wanted to kill myself." Raymond sees himself as passive, a follower rather than a leader, not a self starter, usually does not initiate activity.

I also interviewed Mr. Edward DeFalco, an attorney, who originally became involved with the Anderson family by being Terry Anderson's "Big Brother." I spoke with Mr. DeFalco for about 45 minutes over the phone. Mr. DeFalco related an incident when Raymond was very young which demonstrated his inability to accept the absence of his mother. He became angered at his two younger brothers when they would not participate in a game that he had invented wherein he would pretend to speak to his mother on the play phone. Their refusing to participate in his comforting fantasy situation distressed Raymond greatly.

Mr. DeFalco also related that Raymond worked tirelessly at the YMCA Children's Day Care operation, stating, "He always felt that that was where he belonged," since Raymond was trying to make sure that none of those children would suffer the way that he had.

In summary, the loss of life in this tragedy, requires punishment, but this is a person who will no doubt grow while in prison and hopefully have the opportunity to contribute to society at some point. Raymond Anderson is not a typical predator of society but was swept up in a storm surge of sociopathic behavior. From interviews with Mr. Anderson, his aunt, his mother, Mr. DeFalco, and a review of Casby Harrison's letter, it appears to this psychiatrist that here we have a young man who unfortunately stayed in character by not having the independence or courage to dissociate himself from a tragic circumstance.

Respectfully submitted,

Ronald M. Stewart, M.D.

Ronald M. Stewart, MD,
Consultant in Psychiatry